**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| JOSE DANIEL GUERRA-CASTAÑEDA, |
| *Plaintiff*, |
| v. |
| UNITED STATES OF AMERICA, |
| *Defendant*. |

Civil No. _____

## COMPLAINT

1.      Plaintiff Jose Daniel Guerra-Castañeda brings this civil complaint for damages, for torts committed against him by employees of the United States Immigration and Customs Enforcement ("ICE") and the United States Department of Homeland Security ("DHS").

2.      Plaintiff Guerra-Castañeda brings this complaint under the Federal Tort Claims Act.

## PRELIMINARY STATEMENT

3.      Employees of Defendant United States of America ("United States"), specifically its agencies ICE and DHS, wrongfully deported Plaintiff Guerra-Castañeda to El Salvador, in violation of multiple direct court orders, internal communications and notifications staying his deportation. As a result, he was incarcerated in a Salvadoran prison for 297 days where he experienced torture and other forms of physical and emotional trauma.

4.      The harm Plaintiff Guerra-Castañeda suffered was foreseeable. The United States government has known and documented the human rights abuses perpetrated by the Salvadoran government, including at Salvadoran prisons. *See 2020 Country Reports on Human Rights*

*Practices: El Salvador*, U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor (Mar. 30, 2021), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/el-salvador/.

5.      The acts and omissions of employees of Defendant United States directly and proximately caused Plaintiff Guerra-Castañeda's extensive torture and his detention under inhumane conditions.

## PARTIES

6.      Plaintiff Jose Daniel Guerra-Castañeda is a Salvadoran national who currently resides in Massachusetts. He received special immigrant juvenile status on September 28, 2021.

7.      Defendant United States is a sovereign sued under the Federal Tort Claims Act, under which the United States has waived its sovereign immunity for claims of negligence, negligent infliction of emotional distress, and wrongful deportation arising from the wrongful acts or omissions of its agents acting within the scope of their employment.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1346(b)(1).

9.      Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, Plaintiff Guerra-Castañeda filed a Notice of Claim with ICE and DHS on September 9, 2021.  Ex. 1, Notice of Claim.  Neither ICE nor DHS has responded to the Notice of Claim.

10.      The acts or omissions giving rise to the claim occurred in the District of Massachusetts, and Plaintiff Guerra-Castañeda currently resides in the District of Massachusetts. Venue is therefore proper under 28 U.S.C. § 1402(b).

**FACTUAL ALLEGATIONS**

A.   **Plaintiff Guerra-Castañeda entered the United States as a teenager seeking asylum
and settled in Massachusetts.**

11.   Guerra-Castañeda was born in El Salvador in November 1996.

12.   Throughout his childhood in El Salvador, Plaintiff Guerra-Castañeda's mother and
stepfather repeatedly inflicted physical and emotional abuse on him.

13.   Plaintiff Guerra-Castañeda also endured beatings by his uncle, a Salvadoran
police officer, and other Salvadoran policemen.

14.   At the age of eighteen, Plaintiff Guerra-Castañeda emigrated to the United States
on or about June 9, 2015, seeking asylum.

15.   Plaintiff Guerra-Castañeda crossed the United States border into Texas and was
promptly taken into U.S. Customs and Border Protection ("CBP") custody.

16.   On July 5, 2015, DHS / ICE commenced removal proceedings against Plaintiff
Guerra-Castañeda before the Houston Immigration Court. Based on Plaintiff's credible fear of
returning to El Salvador and lack of any criminal history, ICE set a $12,000 bond for his
conditional release.  Ex. 2, Notice to EOIR.  Plaintiff Guerra-Castañeda paid the bond and was
released from detention.

17.   Plaintiff Guerra-Castañeda then relocated to New Bedford, Massachusetts and
changed the venue of his removal proceedings to the Boston Immigration Court.

18.   During the three years he lived in New Bedford, he received a new passport from
the Salvadoran consulate in Boston, a work permit from United States Citizenship and
Immigration Services ("USCIS"), and a Massachusetts driver's license.

B.   **ICE apprehended Plaintiff Guerra-Castañeda on account of false criminal
allegations against him in El Salvador.**

19.   In mid-2018, Plaintiff Guerra-Castañeda learned that the International Criminal

3

Police Organization ("INTERPOL") had issued a "Red Notice"[1] for his arrest based on allegations that he had committed aggravated homicide in El Salvador and was a member of the violent criminal organization MS-13.

20.     These charges were false, unfounded, and ultimately dismissed by the Salvadoran government and Salvadoran court.

21.     After learning of the issuance of the Red Notice, Plaintiff Guerra-Castañeda did not flee. He continued living at his then-current residence and working at his job.

22.     Instead of fleeing, Plaintiff Guerra-Castañeda visited the Salvadoran consulate on or about August 22, 2018 to request the documents needed to receive his criminal record in El Salvador after learning about the existence of the Red Notice and that he was wanted for murder. However, there were numerous other visitors at the consulate that day and he was unable to see a consular officer.

23.     Plaintiff Guerra-Castañeda was returning to his residence when, in response to INTERPOL's Red Notice, ICE apprehended him at a local convenience store and placed him back in immigration detention.

24.     Plaintiff Guerra-Castañeda remained in ICE custody for the duration of his detention.

25.     Appearing in front of the Boston Immigration Court, Plaintiff Guerra-Castañeda applied for asylum, statutory withholding of removal, and protection under the Convention Against Torture ("CAT").  Plaintiff Guerra-Castañeda advanced, *inter alia*, the following claims:

---

[1] INTERPOL defines a "Red Notice" as "a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action." *What is a Red Notice?*, INTERPOL (last visited Apr. 6, 2022), https://www.interpol.int/en/How-we-work/Notices /View-Red-Notices#:~:text=Red%20Notices %20are%20issued%20for,surrender%2C%20or%20 similar%20legal% 20action; *see also Hernandez-Lara v. Lyons*, 10 F.4th 19, 24–25 (1st Cir. 2021) (explaining that a Red Notice alone "is not a sufficient basis to arrest, much less detain or extradite, the 'subject' of the notice 'because it does not meet the requirements for arrest under the 4th Amendment to the Constitution").

(i)      that the multiple beatings he suffered as a child in El Salvador at the hands of his

mother, his uncle (a Salvadoran police officer), and other Salvadoran police

officers justified an award of asylum and withholding of removal;

(ii)     that he believed his uncle concocted the false allegation giving rise to the Red

Notice in an effort to further torment him; and

(iii)    that his credible fear of torture once in the custody of Salvadoran authorities

should he return to El Salvador entitled him to relief under the CAT.

26.      On January 8, 2019, the Boston Immigration Court denied all of Plaintiff Guerra-

Castañeda's claims and ordered him removed to El Salvador.  Ex. 3, 1/8/19 Immigration Court

Order.

27.      Plaintiff Guerra-Castañeda filed a timely appeal to the Board of Immigration

Appeals ("BIA"), the appropriate administrative immigration appellate body.  Ex. 4, BIA

Appeal.  The BIA denied his appeal.  Ex. 5, 6/24/19 BIA Order.

28.      On July 23, 2019, Plaintiff Guerra-Castañeda timely filed a petition for review in

the United States Court of Appeals for the First Circuit (the "First Circuit").  Ex. 6, Petition for

Review.

29.      After Plaintiff Guerra-Castañeda's petition for review was docketed with the First

Circuit, the United States—represented by the Department of Justice's Office of Immigration

Litigation ("OIL")—filed a notice of intent on August 19, 2019 to deport him to El Salvador

pursuant to Local Rule 18[2] of the First Circuit.  Ex. 7, Notice of Intent to Remove

30.      On August 28, 2019, an ICE officer at the Boston Field Office notified OIL via

---

[2] Local Rule 18 governs administrative stay and judicial stay of removal (deportation). Once a stay motion is filed with the court, the First Circuit stays removal of a noncitizen (petitioner) for 10 business days. During this period, ICE is not authorized to remove the noncitizen and the court must determine whether a judicial stay of removal is warranted under the standard provided by the Supreme Court.

email that Plaintiff Guerra-Castañeda "was scheduled for removal to El Salvador on September 6, 2019, and that he would be transferred to Oakdale, Louisiana on September 3, 2019, in order to stage him for removal."  Ex. 8, Guarna-Armstrong Aff. ¶ 13.

31.     Before Plaintiff Guerra-Castañeda's transfer to Louisiana, ICE detained him at the Strafford County Department of Corrections in Dover, New Hampshire.  Ex. 9, Transfer Worksheet.

**C.     The First Circuit issued two orders staying Plaintiff Guerra-Castañeda's deportation.**

32.     On August 29, 2019, Plaintiff Guerra-Castañeda filed an emergency motion to stay removal with the First Circuit.  Ex. 10, 8/29/19 Motion to Stay Removal. William P. Barr, in his capacity as Attorney General, had appeared through counsel in the First Circuit proceeding and received a copy of the Motion to Stay Removal via CM/ECF.  Ex. 11, Notice of Appearance of Giovanni B. Di Maggio.

33.     In his stay motion, Plaintiff Guerra-Castañeda emphasized that as a (falsely) accused MS-13 member, he would likely be imprisoned in one of the seven prisons designated for the "extraordinary measures" implemented by the Salvadoran government to curb gang activity.

34.     The United States government knew that in these seven prisons human rights violations routinely occurred, and prisoners died while in detention—including by homicide.[3]

35.     The United States filed a response to the Motion to Stay Removal at 11:22 a.m. on August 30, 2019.

---

[3] *See El Salvador End of Mission Statement*, Agnes Callamard, United Nations Special Rapporteur for Extrajudicial, Summary or Arbitrary Executions (February 5, 2018), https://www.ohchr.org/EN/NewsEvents/Pages/Display News.aspx?NewsID=22634; *see also* State Department Human Rights Report 2019: https://www.state.gov/wp-content/uploads/2020/02/EL-SALVADOR-2019-HUMAN-RIGHTS-REPORT.pdf.

36.    At 4:10 p.m. on August 30, 2019, the First Circuit entered an order granting a temporary stay of removal (the "First Stay Order") until September 13, 2019, to give the Court an opportunity to fully review Plaintiff Guerra-Castañeda's motion.  Ex. 12, 8/30/19 Stay Order.

37.    DOJ counsel was copied on the notice of the First Stay Order that was issued by the First Circuit and received service of the First Stay Order via CM/ECF.  *Id.*

38.    On September 11, 2019, at 4:10 p.m., the First Circuit ordered a full stay of Plaintiff Guerra-Castañeda's removal (the "Second Stay Order" and, together with the First Stay Order, the "Stay Orders") during the pendency of his petition for review.  Ex. 13, 9/11/19 Second Stay Order.

39.    DOJ counsel was copied on the notice of the Second Stay Order that was issued by the First Circuit and received service of the Second Stay Order via CM/ECF.  *Id.*

40.    In the Second Stay Order, the First Circuit emphasized that "the parties are advised to direct particular attention in their merits briefs to the CAT claim and to the agency's conclusion that [Plaintiff Guerra-Castañeda did 'not present[] any evidence that he will be detained in a prison governed by . . . 'extraordinary measures.''"  *Id.*

41.    On September 12, 2019, while the Stay Orders were pending, ICE guards at the Louisiana staging facility informed Plaintiff Guerra-Castañeda that he was scheduled to return to El Salvador in the morning.  He was extremely concerned for his safety. Ex. 14, Froes Aff. ¶ 9.

42.    Plaintiff Guerra-Castañeda informed the ICE guards that the Stay Orders prohibited his deportation. An ICE officer responded that the employee had requested confirmation of the Stay Orders via email and asserted that Plaintiff Guerra-Castañeda would nonetheless be deported if the officer did not receive confirmation before it came time to ready Plaintiff Guerra-Castañeda for his scheduled removal flight to El Salvador.

43.     Plaintiff Guerra-Castañeda relayed this interchange to his immigration counsel, Attorney Froes, that same day. Attorney Froes assured Plaintiff Guerra-Castañeda that he could not be deported to El Salvador because of the Stay Orders.  Ex. 14, Froes Aff. ¶ 10.

**D.     The ICE Boston Field Office was responsible for Plaintiff Guerra-Castañeda's deportation.**

44.     The ICE Boston Field Office had "administrative control over" Plaintiff Guerra-Castañeda's deportation.  Ex. 15, 9/16/19 Hagan Decl. ¶ 3.

45.     An individual ICE staging facility "does not have control of each case in order to check each detainee to ensure that the removal can proceed because control remains with the responsible ERO Field Office."  Ex. 16, 9/26/19 Hagan Decl. ¶ 4. The ICE Boston Field Office had control in Plaintiff Guerra-Castañeda's case.

46.     According to ICE policy and procedure, "It is dependent upon [the ICE Field Office] retaining control of the case to review each case to confirm that there is no impediment to removal and notify [the staging facility] if there is an impediment to removal." *Id.*

**E.     Multiple errors by ICE personnel caused Plaintiff Guerra-Castañeda's wrongful deportation.**

47.     On September 3, 2019 while the First Stay Order was pending, ICE transferred Plaintiff Guerra-Castañeda from the Strafford County Department of Corrections in Dover, New Hampshire to Oakdale, Louisiana in preparation for deporting him to El Salvador.  Exhibit 8, Guarna-Armstrong Aff. ¶ 16.

48.     Shortly before noon on September 3, 2019, the ICE Boston Field Office "received an email from OIL notifying that the First Circuit had issued a temporary stay of removal until September 13, 2019."  *Id.* at ¶ 14.

49.     That same day, an individual at the ICE Boston Field Office "entered a comment into the Enforce Alien Removal Module ("EARM") system" noting that (i) a temporary stay order

was in effect until September 13, 2019, and (ii) ICE should not deport Plaintiff Guerra-Castañeda "until and unless OIL notified [ICE] that the First Circuit had lifted the stay of removal." *Id.* at ¶ 15.

50.    Also on September 3, 2019, the ICE Boston Field Office notified the officers at the Boston ICE Air Operations Unit, "advising that a temporary stay of removal had been granted and that [Plaintiff Guerra-Castañeda] should not be removed from the United States." *Id.* at ¶ 17.

51.    The ICE Louisiana Field Office also received an email from the ICE Boston Field Office on September 3, 2019, directing that Plaintiff "Guerra-Castañeda be removed from the manifest of the flight that was to occur on Friday, September 6, 2019." Ex. 15, 9/16/19 Hagan Decl. ¶ 5.

52.    On September 4, 2019, individuals in the ICE Boston Field Office contacted multiple officers in the ICE Louisiana Field Office to inform them of the First Stay Order and directed that Plaintiff Guerra-Castañeda "be taken off the manifest for his scheduled September 6, 2019, removal flight and that he be returned to a detention facility within [the ICE Boston Field Office's] jurisdiction the following week." Exhibit 8, Guarna-Armstrong Aff. ¶ 18.

53.    On the same date, Supervisory Detention and Deportation Officer ("SDDO") Hagan from the Alexandria Staging Facility of the ICE Louisiana Field Office sent an email to eleven ICE officers, including Deportation Officer ("DO") Glen W. Noblitt, requesting that Plaintiff Guerra-Castañeda be pulled from any removal flight and returned to Boston. Ex. 17, Noblitt Decl. ¶ 4; Ex. 15, 9/16/19 Hagan Decl. ¶ 5.

54.    SDDO Hagan never entered this information in EARM. Ex. 17, Noblitt Decl. ¶ 7.

55.    On the afternoon of September 6, DO Noblitt "saw that an ICE Form I-203, Order

to Detain or Release, and an ICE Form I-216, Record of Person and Property Transfer, bearing [Plaintiff] Guerra-Castañeda's name and Alien Registration Number had been left in the mailbox for outgoing removal flights to El Salvador." *Id.* at ¶ 6.

56.    ICE procedures require that the Form I-216 be faxed by the Field Office transferring the detainee to the Field Office receiving the detainee prior to any transfer.  Ex. 18, ICE Detainee Transfer Procedures at 3.

57.    DO Noblitt checked Plaintiff "Guerra-Castañeda's Alien number listed on the forms and determined that he was a detainee" at the Natchitoches Parish Detention Center in Louisiana.  Ex. 17, Noblitt Decl. ¶ 6.

58.    DO Noblitt checked EARM and saw that the field indicating a stay of removal "had not been activated." *Id.* at ¶ 7.

59.    DO Noblitt asserts that "[w]hile there was information regarding a potential stay [order] in the Comments section of EARM, [he] did not click that tab to read the comments and erroneously assumed that [he] had missed placing [Plaintiff] Guerra-Castañeda on the next available flight to El Salvador that was departing on September 13, 2019." *Id.*

60.    Believing that Plaintiff "Guerra-Castañeda had no stay or other impediment to removal, [DO Noblitt] requested that [ICE Air Operations] add [Plaintiff] Guerra-Castañeda to the next flight to El Salvador." *Id.* at ¶ 8.

61.    On September 12, 2019, at 4:54 p.m.—over 24 hours after the First Circuit's issuance of the Second Stay Order—OIL sent an email to BOS-STAYS, a group email specifically dedicated to notifications of court stay orders, about the order. Ex. 8, Guarna-Armstrong Aff. ¶ 20.

62.    The ICE Boston Field Office received this email at 4:57 p.m. that day. *Id*.

63.     At 9:53 a.m. on September 13, 2019—almost two hours after Plaintiff Guerra-Castañeda's deportation—the ICE Boston Field Office entered a comment about the Second Stay Order into EARM.  *Id*. at ¶ 22.

**F.     ICE employees deported Plaintiff Guerra-Castaneda to El Salvador notwithstanding First Circuit orders staying his deportation.**

64.     On September 13, 2019, at approximately 8:00 a.m., ICE employees placed Plaintiff Guerra-Castañeda on a charter removal flight from Louisiana to El Salvador.  Ex. 8, Guarna-Armstrong Aff. ¶ 21.

65.     Approximately 15 minutes later, an ICE officer assigned to Plaintiff Guerra-Castañeda's case informed Attorney Froes that Plaintiff Guerra-Castañeda was on a flight to Boston.  Ex. 14, Froes Aff. ¶ 20.

66.     At or about 2:15 p.m., Attorney Froes learned that Plaintiff Guerra-Castañeda had not been returned to Boston; he had been deported to El Salvador.  Ex. 14, Froes Aff. ¶ 13.

67.     On that same day, Attorney Froes informed OIL that Plaintiff Guerra-Castañeda had been deported.

68.     OIL then notified the First Circuit that Plaintiff Guerra-Castañeda had been removed from this country without authorization.  Ex. 19, Notice of Removal.

69.     On September 14, 2019, the First Circuit issued an order to show cause as to why Attorney General William Barr should not be held in contempt and to explain how and why Plaintiff Guerra-Castañeda was removed.  Ex. 20, 9/14/19 Show Cause Order.

**G.     Plaintiff Guerra-Castañeda suffered physical and emotional torture and abuse while in El Salvador.**

70.     When the airplane landed in El Salvador on September 13, 2019, Plaintiff Guerra-Castañeda was in shock. Two ICE officers came inside the airplane and handcuffed him when he resisted walking out.

71.     Salvadoran police officers and four journalists were present when Plaintiff
Guerra-Castañeda deplaned.  They took pictures of him, and the Salvadoran police identified him
as a gang member of MS-13 with homicide charges who had escaped to the United States.  News
of Plaintiff Guerra-Castañeda's arrival was widely distributed in the Salvadoran media.  Ex. 21,
Online Article.

72.     Salvadoran police then transferred Plaintiff Guerra-Castañeda to the prison
Bartolinas de Cajutepeque, where he was held in Cell #2.

73.     Plaintiff Guerra-Castañeda feared that he could be hurt or killed by gang members
while in the prison.

74.     Cell #2 was overcrowded and consisted of a box of metal reinforced with iron
bars and containing approximately 55 other detainees. The cell had poor ventilation and only one
toilet; there was no shower.

75.     During his detention, individuals Plaintiff Guerra-Castañeda believed to be
Salvadoran law enforcement agents routinely assaulted him. He was forced to hold position with
his legs open, knees bent, and his hands cuffed behind his neck. If he moved or fell due to
fatigue, the agents would beat him again and force him to do five hundred squats.

76.     During his detention, he became dehydrated and developed infections in his feet,
as well as contusions, hematomas, and muscle aches all over his body. When his mother
attempted to bring medication to him, prison officials confiscated the medication and did not
allow Plaintiff Guerra-Castañeda to access it.

77.     Individuals Plaintiff Guerra-Castañeda believed were Salvadoran agents gave him
a written statement and threatened to kill him if he did not sign it. Plaintiff Guerra-Castañeda
believes that statement contained an admission of guilt to the pending Salvadoran criminal

charges. When Plaintiff Guerra-Castañeda refused to sign, the agents hit his head with the butt of a rifle.

78.     Individuals that Plaintiff Guerra-Castañeda believed were Salvadoran agents also suspended him using a rope attached to his handcuffs. Plaintiff Guerra-Castañeda thought that he was going to die. For about two hours, four men dressed in black beat his genitalia and other parts of his body.

79.     At other times, individuals Plaintiff Guerra-Castañeda believed were Salvadoran agents dragged him through the prison corridor, which was full of feces and urine.

80.     Plaintiff Guerra-Castañeda suffered physical torture and abuse on approximately ten to fifteen different occasions while in the Bartolinas de Cajutepeque.

81.     Once the agents were finished torturing Plaintiff Guerra-Castañeda, they left him in Cell #2 until he was released on July 6, 2020—297 days after ICE brought him to El Salvador.

82.     The Salvadoran prison did not feed the prisoners it housed; the prisoners' family members had to supply their food.

83.     Plaintiff Guerra-Castañeda's family could not afford to provide subsistence-level nourishment during his detention, causing his weight to drop from 240 to 140 pounds during the course of his incarceration.  Ex. 22, Medico-Forensic Report ¶ 3.

84.     As a result of the defendants' actions and inactions, Plaintiff Guerra-Castañeda was wrongfully in the Salvadoran authorities' custody for 297 days during which he suffered numerous and repeated instances of torture and intimidation.

**H.     The physical and psychological injuries Plaintiff Guerra-Castañeda endured as a result of his wrongful deportation continue to cause him harm.**

85.     Plaintiff Guerra-Castañeda continues to experience severe physical injuries, physical and psychological pain and suffering, and severe emotional distress.

86.    Plaintiff Guerra-Castañeda has trouble sleeping.

87.    He experiences lingering back pain.

88.    Seeing his scars, showering, and eating can cause Plaintiff Guerra-Castañeda to relive memories of being beaten, being deprived of food, and being denied the ability to shower while in the Bartolinas de Cajutepeque.

## CLAIMS FOR RELIEF

### COUNT I

*Federal Tort Claims Act - Negligence*

89.    Plaintiff Guerra-Castañeda incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

90.    Employees of Defendant owed a duty of care to Plaintiff Guerra-Castañeda.

91.    The duty Defendant owed to Plaintiff required them to, among things, comply with court orders; adhere to and execute policies for handling of detainees; enter required information into the database; timely review the information in the database; check records to ensure deportation is in compliance with court orders, policies and procedures and applicable law; establish policies and procedures to accurately monitor the location and removal status of detainees in Defendants' custody; and to otherwise avoid the unlawful deportation of a detainee.

92.    Employees of Defendant breached the duty they owed Plaintiff Guerra-Castañeda when they: (1) failed to flag the temporary stay of removal order in the Government's database; (2) otherwise ignored the Stay Orders; (3) sent Plaintiff Guerra-Castañeda to Louisiana; and (4) deported him to El Salvador.

93.    Accordingly, the acts and omissions alleged herein constitute breaches of that duty of care with respect to Plaintiff Guerra-Castañeda by federal employees while acting in the

scope of their office or employment.

94.     Officials at ICE and DHS were aware or should have been aware of the First

Circuit's issuance of the Stay Orders.

95.     The employees' breach of their duty of care was both the direct and proximate

cause and a substantial factor in causing the unlawful deportation and subsequent torture

experienced by Plaintiff Guerra-Castañeda in El Salvador.

96.     Further, Plaintiff Guerra-Castañeda's torture in a Salvadoran prison was a

foreseeable result of the wrongful deportation in light of the Salvadoran Government's false claims

that Plaintiff was a member of MS-13.

97.     The actions or omissions by Defendant's employees described herein constitute

negligence under the laws of the Commonwealth of Massachusetts.

98.     Under the Federal Torts Claims Act, Defendant United States is liable for these

acts or omissions.

## COUNT II

*Federal Tort Claims Act - Negligent Infliction of Emotional Distress*

99.     Plaintiff Guerra-Castañeda incorporates by reference each allegation in the

preceding paragraphs as if fully set forth herein.

100.    Employees of Defendant owed Plaintiff Guerra-Castañeda a duty of care.

101.    Employees of Defendant breached their duty of care by, *inter alia*, deporting

Plaintiff Guerra-Castañeda to El Salvador despite the First Circuit's issuance of the Stay Orders.

102.    Defendant's employees' breaches of their duty of care were both the direct and

proximate cause of and a substantial factor in causing the unlawful deportation and torture

experienced by Plaintiff Guerra-Castañeda in El Salvador.

103.    As a result of Defendant's employees' breaches, Plaintiff Guerra-Castañeda has

experienced emotional pain and suffering, including physical harm with objective symptoms resulting from circumstances in which a reasonable person would have suffered emotional distress if subjected to the same conditions and treatment as Plaintiff Guerra-Castañeda.

## COUNT III

*Federal Tort Claims Act - Wrongful Deportation*

104.    Plaintiff incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

105.    A federal court's order, staying removal proceedings, "temporarily suspend[s] the source" of the Attorney General's "authority to act," resulting in a "setting aside of … [the] authority to remove" the individual.  *Arce v. U.S.*, 899 F.3d 796, 799–800 (9th Cir. 2018).

106.    Accordingly, "A decision or action to violate a court order staying removal … falls outside of the [8 U.S.C. § 1252(g)'s] jurisdiction-stripping reach."  *Id.*

107.    Where a court order staying deportation of an individual is in effect, the Attorney General "entirely lack[s] the authority, and therefore the discretion, to remove him."  *Id.*

108.    Despite the First Circuit's Stay Orders, the Defendants removed Plaintiff Guerra-Castañeda to El Salvador.

109.    The Federal Torts Claims Act makes the Defendants liable for the above-alleged acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jose Daniel Guerra-Castañeda respectfully requests that this Honorable Court grant him the following relief:

1.   Damages in an amount to be proven at trial; and

2.   Any such other relief that the Court may deem just and proper.

Respectfully submitted,


JOSE DANIEL GUERRA-CASTAÑEDA

By and through his attorneys,


*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (Mass. BBO No. 669225)
SangYeob Kim (N.H. 266657)*
AMERICAN CIVIL LIBERTIES UNION OF NEW
   HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.  603.224.5591
gilles@aclu-nh.org
sangyeob@aclu-nh.org


William C. Saturley (Mass. BBO No. 442800)
Rue K. Toland (Mass. BBO No. 703056)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
wsaturley@preti.com
rtoland@preti.com

* *Pro hac vice* motion is forthcoming